UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

═══════════════════════════════════

INSTALLED BUILDING PRODUCTS, LLC,

                              Plaintiff,

                                                    **REPORT AND**
                                                    **RECOMMENDATION**

            v.
                                                    13-CV-1112A

SCOTT COTTRELL and
AMERICAN BUILDING SYSTEMS,

                              Defendants.

═══════════════════════════════════

## I.    INTRODUCTION

The Hon. Richard J. Arcara has referred this case to this Court under 28

U.S.C. § 636(b).  Pending before the Court is a motion (Dkt. No. 11) by

defendants Scott Cottrell ("Cottrell") and American Building Systems ("ABS") to

dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure

("FRCP").  Plaintiff Installed Building Products, LLC ("IBP") sued defendants to

enforce a restrictive covenant between it and Cottrell after it fired Cottrell and he

joined ABS.  Defendants believe that IBP has failed to allege any violations of the

restrictive covenant beyond Cottrell's decision to start working for ABS.

Additionally, defendants argue that the restrictive covenant in question is

unenforceable as contrary to New York public policy because it restricts a mere

salesman's livelihood for too long a period of time over too large a geographical

area.  Finally, to the extent that IBP attached to its motion papers factual affidavits and information that did not appear in the complaint, defendants accuse IBP of trying to "back-fill" its complaint and urge the Court to stay within the four corners of the complaint.

IBP opposes defendants' motion in all respects.  IBP considers the restrictive covenant enforceable because of the managerial responsibility that Cottrell had while he worked for the company and because of the proprietary inside information that he acquired during that time.  IBP further argues that it has stated valid claims related to Cottrell's fiduciary duties based on the likelihood that Cottrell will use inside information from IBP to give ABS an unfair advantage.

The Court held oral argument on March 7, 2014.  For the reasons below, the Court respectfully recommends granting defendants' motion.

## II.     BACKGROUND

This case concerns allegations that Cottrell hurt IBP by bringing its inside sales and operating information to a direct competitor right after IBP fired him. Both companies in this case sell and install home-improvement products.  IBP, a Delaware company with a principal place of business in Ohio and over 80 locations nationwide, "is engaged in the business of selling, marketing and installing a wide range of building products, including, but not limited to: wall insulation; attic insulation; spray fiberglass; spray foam; masonry insulation; seamless gutters and leaf protection; metal roofs; soffit and fascia; vinyl shutters;

2

shower doors and bath hardware; shelving and mirrors; custom closets; garage

doors; acoustical ceilings; fireplaces and fire stopping." (Dkt. No. 1 at 2 ¶ 1.)

ABS, apparently a New York company, "is engaged in the business of selling and

installing a wide range of building products, including insulation, and is in direct

competition with IBP." (*Id.* ¶ 3.) The basic chronology of events is not in dispute.

Cottrell worked for IBP from September 20, 2004 until September 19, 2013.

When Cottrell began working for IBP, he started as a salesman at a location in

Sanborn, New York. In May 2007, Cottrell became a Branch Manager at IBP's

location in Erie, Pennsylvania. On November 1, 2010, Cottrell signed a

document called a Confidentiality, Nonsolicitation and Noncompetition Agreement

(the "Agreement") because IBP required him to do that to maintain his

employment. The Court will address the relevant details of the Agreement below.

In December 2011, IBP closed its Erie location and brought Cottrell back to the

Sanborn location. When Cottrell returned to the Sanborn location, he assumed

the titles of Insulation and Gutter Foreman and Residential and Commercial

Salesperson. The record is not clear as to whether anyone at the Sanborn

location had the title of "Manager" or "Branch Manager" when Cottrell returned.

Nonetheless, and for purposes of the pending motion, the Court accepts IBP's

assertion that "Cottrell was the highest ranking person at the Sanborn, New York

facility and he supervised the activities of at least 12 employees, [and] in addition

to his responsibilities for servicing the Sanborn, New York market, and managing

3

the employees, Cottrell continued to have responsibility for servicing the Erie,

Pennsylvania market." (*Id.* at 7 ¶ 15.)

The alleged events that prompted this case began in September 2013.  On

September 19, 2013, IBP fired Cottrell "because of unsatisfactory performance,

including, but not limited to, selling work to one of IBP's customers at a

below-market rate to IBP's detriment." (*Id.* at 7 ¶ 16.)  On or around October 15,

2013, IBP learned that Cottrell was working for ABS.  A few days later, on

October 18, 2013, counsel for IBP sent Cottrell and ABS cease and desist letters

advising each of them of what it considered Cottrell's obligations under the

Agreement.  Defendants either did not respond to the letters or expressed an

opinion to the effect that the Agreement is not enforceable.

The Agreement contains several provisions that relate to the pending

motion.  The second recital paragraph contains an acknowledgment that "[i]n the

course of Employee's employment with the Company, Employee has been given

access to proprietary information regarding the Company's business, and has

been provided with training in the Company's business methodologies.  The

parties agree that if the Company's proprietary information were to be disclosed

to a competitor, or if the training received by Employee were to be used for the

benefit of a competitor, that such events would likely have a material adverse

affect on the Company's business." (Dkt. No. 1-1 at 1.)  Other relevant provisions

consist of the following:

4

1.  Section 1 specifies that Cottrell received compensation for entering the Agreement, a combination of $12,500.01 cash and 15,860 shares in the holding company that was "an indirect owner of 15%" of IBP.  (*Id.*)

2.  Section 2(a) specifies that Cottrell "has been given, and will continue to be given, training in the Company's methodologies as well as access to certain confidential and proprietary information concerning the business and financial affairs of the Company and its Affiliates (as defined herein) which constitutes trade secrets under state law, as well as certain other confidential and proprietary information concerning the business and financial affairs of the Company and its Affiliates that may not constitute trade secrets under state law, but are nonetheless confidential."  (*Id.* at 2.)

3.  Section 2(b) defines various types of information from IBP as confidential and proprietary, including product and sales methods and processes; customer lists, and financial information.

4.  Section 2(c) sets forth that "[t]he Company and its Affiliates have a legitimate business interest in (i) the Confidential Information, (ii) relationships with their customers, suppliers and employees, and (iii) their business goodwill."  (*Id.*)

5.  Section 3 of the Agreement contains restrictions on competition and solicitation that the Court will label collectively as the "restrictive covenant."  Section 3(a) states that "for a period beginning on the date hereof and continuing through the second anniversary of the termination of Employee's employment with the Company or any of its Affiliates for any reason (the "Restrictive Period"), Employee will not, either for Employee's own account or in the service of or on behalf of any other person or entity, directly or through others, engage or invest in the business of selling, marketing or installing the building products sold, marketed or installed by the Company (which products shall include residential and commercial insulation, gutters, garage doors, fireplaces, closet shelving, shower doors and mirrors)(the "Business") within a 100 mile radius of the branch of the Company that is currently managed

by Employee in Erie, Pennsylvania and within a 100 mile radius of each branch of the Company and its Affiliates that are hereafter managed or supervised by Employee, wherever located."  (*Id.*)

6.      For the sake of the record, the Court takes judicial notice[1] that the geographic portion of the restrictive covenant looks like this when placed on a map:



Fig. 1.  A 100-mile radius (green) around Sanborn, NY and Erie, PA.  Courtesy http://www.freemaptools.com/radius-around-point.htm.

7.      Section 3(b) states that "during the Restrictive Period, Employee will not, either for Employee's own account or in the service of or on behalf of any other person or entity, directly or through others, take any action to (i) solicit, call upon, or

---

[1] "We may, of course, take judicial notice of geography."  *Boyce Motor Lines v. U.S.*, 342 U.S. 337, 344 (1952); *cf. W. Mohegan Tribe & Nation v. Orange Cnty.*, 395 F.3d 18, 22 (2d Cir. 2004) (taking judicial notice of "submerged lands" not specified in the complaint).

initiate communication or contact with any customer or prospective customer of the Company or any Affiliate with whom Employee had contact during the last twelve months of Employee's employment, with a view to selling, marketing or installing any service or product that is sold, marketed or installed by the Business, or (ii) attempt to divert any customer, supplier or vendor of the Company or its Affiliates from doing business with such entity." (*Id.* at 3.)

8.      Section 3(c) states that "during the Restrictive Period, Employee will not, either for Employee's own account or in the service of or on behalf of any other person or entity, directly or through others, (i) induce or attempt to induce any employee of the Company or its Affiliates to leave the employ of such entity, or (ii) employ, or otherwise engage as an employee, independent contractor, or otherwise, any employee of the Company or its Affiliates." (*Id.*)

9.      The restrictive covenant in Section 3 concludes with an exception stating that "[t]he provisions of this Section 3 shall not be effective if the Company or its successor closes its all [sic] of its branches and ceases operations in the territory described in paragraph (a)." (*Id.*)

10.     Section 7 contains a severability provision stating that "[i]f any court determines that any provision of Section 2 or 3 hereof is unenforceable for any reason, including the duration or scope of such provision, the provision shall not be deemed void, and the court shall have the power to amend such provision, and, in its amended form, the provision shall remain in full force and effect.  In the event that any provision of this Agreement is found to be void or unenforceable to any extent for any reason and such provision is not, or cannot be, so reformed, it is agreed that such provision shall be severable and that all remaining provisions of the Agreement shall remain in full force and effect." (*Id.* at 4.)

11.     Section 12 sets forth in one sentence that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Ohio without giving effect to conflict of law provisions."

IBP commenced this case by filing its complaint on November 12, 2013.  In the background section of the complaint, IBP pleads several prospective actions that Cottrell might take now that he works for a direct competitor like ABS:

> 12.  "Upon information and belief, Cottrell will attempt to solicit customers of IBP with whom he had contact during his last twelve months of employment at IBP, and will attempt to divert customers, suppliers, or vendors of IBP from doing business with IBP.  Such solicitations and attempted diversions would violate the Agreement and likely damage IBP."  (Dkt. No. 1 at 7 ¶ 18.)

> 13.  "Upon information and belief, Cottrell will attempt to induce employees of IBP or its Affiliates to leave the employ of such entities.  Such inducement would violate the Agreement."  (*Id.* ¶ 19.)

> 14.  "Upon information and belief, Cottrell is using IBP's confidential information to gain an unfair advantage, and has in his possession or control confidential information which belongs to IBP.  By virtue of his relationship with ABS, Cottrell is using or will inevitably disclose or use IBP's confidential information for his own benefit and/or for the benefit of ABS unless restrained by an order of this Court."  (*Id.* at 8 ¶ 20.)

Additionally, the complaint contains six counts.  In Count I, IBP accuses Cottrell of violating the Agreement and its restrictive covenant by joining ABS and by taking confidential information with him.  IBP further makes the prospective accusation that Cottrell "will solicit or is soliciting customers and employees of IBP or its Affiliates."  (*Id.* at 8 ¶ 26.)  In Count II, IBP accuses Cottrell of stealing confidential information and trade secrets and using them to its detriment.  In Count III, IBP accuses Cottrell of breaching his duty of loyalty and fiduciary duty

by taking its confidential information and by selling work to an IBP customer at a below-market rate shortly before it fired him.  In Count IV, IBP accuses ABS of tortious interference with its existing customers, suppliers, vendors, and employees; IBP asserts that ABS now knows about IBP's relationships and intends to interfere with them.  In Count V, IBP accuses ABS of tortious interference with the Agreement by hiring Cottrell despite knowing about the Agreement and its restrictive covenant.  In Count VI, IBP accuses Cottrell and ABS of unjust enrichment by exploiting IBP's confidential information.  The complaint ends with a request for permanent injunctive relief that substantially repeats the language of the restrictive covenant.

Defendants filed their motion to dismiss on January 29, 2014.  While acknowledging that fact pleading is not necessary, defendants argue that the complaint contains only one concrete allegation, namely that Cottrell started working for ABS.  According to defendants, every other allegation in the complaint is just a guess.  Defendants concede that IBP is allowed to plead upon information and belief when a reasonable accusation can be substantiated only by factual details within defendants' control.  Defendants, however, argue that IBP falls short of that standard and has pled such events as customer and employee solicitation without asking its customers and employees and without any reason at all to think that these events happened.  Defendants additionally reject the Agreement and its restrictive covenant as unenforceable because

Cottrell was a demoted and fired salesman whose inside knowledge never rose to the level of confidential information.  By extension, defendants argue, if the Agreement is unenforceable then IBP's other claims collapse because they all rest on the presumption that defendants acquired and are exploiting protected and confidential information in violation of the Agreement.

IBP opposes defendants' motion in several ways.  IBP contrasts this case from most of the cases that defendants cite in their papers by noting that most of the cases cited addressed post-discovery dispositive motions or motions for injunctive relief.  By making this point, IBP indirectly is asking the Court, at a minimum, to keep this case open long enough to allow discovery to confirm or to refute its claims.  IBP also argues that the Agreement is reasonable because it gives Cottrell the option of leaving the region or choosing a different industry.  In IBP's view, "the restrictions in the agreement do not impose an undue hardship on Cottrell as they are tailored to the business of installing building products, and do not restrict Cottrell from working in a sales capacity in any other industry or business, or from engaging in the business of installing building products outside the limited geographic area provided for in the Agreement."  (Dkt. No. 15 at 21.) IBP then argues the viability of the other claims in the complaint by inverting defendants' arguments.  According to IBP, Cottrell had access to, *inter alia*, customer requirements, price lists, and pricing information that no one could obtain in the public domain.  If Cottrell thus had access to confidential information

and then knowingly went to work for a direct competitor then the intended and likely exploitation of that information is a reasonable inference that would sustain claims for tortious interference, breach of duties, and unjust enrichment.

## III.   DISCUSSION

### A.   *Dismissal Generally*

When addressing motions to dismiss plaintiffs' claims, courts proceed by "construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citation omitted).  The acceptance of allegations carries the limitation that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks and citations omitted).

11

### B. *New York or Ohio Law?*

Before turning to the merits of the pending motion, the Court needs to address two procedural issues, the first of which concerns choice of law. Does New York or Ohio law govern the Agreement? Section 12 of the Agreement again states that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Ohio without giving effect to conflict of law provisions." (Dkt. No. 1-1 at 5.) In contrast, IBP's cease and desist letters cited New York law, and both sides' motion papers cite New York law. In their motion papers and at oral argument, defendants made a brief argument in favor of New York law. IBP has taken no position on the issue because it believes that it would prevail under either state's law.

"As a court is to apply the choice-of-law rules prevailing in the state in which the court sits, New York law governs the choice of law determination." *Estee Lauder Cos. Inc. v. Batra*, 430 F. Supp. 2d 158, 170 (S.D.N.Y. 2006) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). "In the absence of a violation of a fundamental state policy, New York courts generally defer to the choice of law made by the parties to a contract. However, New York law allows a court to disregard the parties' choice when the 'most significant contacts' with the matter in dispute are in another state. Furthermore, even when the parties include a choice-of-law clause in their contract, their conduct during litigation may indicate assent to the application of another state's law." *Cargill,*

12

*Inc. v. Charles Kowsky Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991) (citing *Haag v. Barnes*, 9 N.Y.2d 554, 559, 216 N.Y.S.2d 65, 68, 175 N.E.2d 441, 443 (1961); other citation omitted).  Factors that affect the analysis of significant contacts include "the places of negotiation and performance; the location of the subject matter; and the domicile or place of business of the contracting parties."  *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 642 N.E.2d 1065, 1068 (N.Y. 1994) (citations omitted).

Here, several circumstances weigh in favor of using New York law.  Of the two locations that Cottrell allegedly managed, one was in New York while the other—in Pennsylvania—was not in Ohio.  While not clear from the record, the Agreement likely was discussed and signed in New York.  *Cf. Am. Equities Grp., Inc. v. Ahava Dairy Prods. Corp.*, No. 01 CIV.5207(RWS), 2004 WL 870260, at *8 (S.D.N.Y. Apr. 23, 2004) (favoring New York for reasons including "that the Agreement was negotiated in New York [and] was signed by Ahava in New York").  Cottrell worked at the New York location for most of his time with IBP. Many of the customers whom IBP thinks Cottrell might steal are in New York. IBP fired Cottrell in New York for alleged underselling that occurred in New York. Both defendants are from New York, and the most concrete allegation of a contractual violation—ABS's hiring of Cottrell—occurred in New York.  *Cf. Cargill*, 949 F.2d at 55 (choosing New York over Massachusetts law where "[defendant] is a New York corporation.  Its principal place of business is in Burnt Hills, New

13

York. [Defendant] placed its orders for gasoline in New York. [Plaintiff] delivered the gasoline to [defendant] in New York. [Plaintiff's] obligation to pay GRT on [defendant's] purchases is imposed by New York statutory law.  Moreover, [plaintiff] and [defendant] have, without exception, based their briefs and arguments in both the district court and this court on New York law.").  Finally, the parties have been using New York law in their motion papers without a single citation to Ohio law.  *Cf. Juergensen Def. Corp. v. Carleton Techs., Inc.*, No. 08–CV–959A, 2010 WL 2671339, at *11 n.5 (W.D.N.Y. June 21, 2010) (Arcara, *J.*) ("Notwithstanding the Florida choice of law and choice of forum clause in Section 17 of the [contract], the parties have litigated this case since December 2008 without ever arguing that this Court lacked jurisdiction or that New York law should not apply.  At no time in the lengthy briefing for the pending motion did the parties cite to Florida law.") (citation omitted).  These circumstances offset IBP's location of its principal place of business in Ohio, the only factor that would favor that state.  The Court thus will proceed using federal procedural law and New York substantive law, in accordance with the *Erie* doctrine.[2]

## C.   *Allegations in the Complaint upon Information and Belief*

The second procedural issue that the Court needs to address concerns IBP's decision to make some of its allegations upon information and belief.  As

---

[2] *See generally Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

mentioned above, IBP made the following assertions in its complaint upon

information and belief:

1.  "Upon information and belief, Cottrell will attempt to solicit customers of IBP with whom he had contact during his last twelve months of employment at IBP, and will attempt to divert customers, suppliers, or vendors of IBP from doing business with IBP.  Such solicitations and attempted diversions would violate the Agreement and likely damage IBP."  (Dkt. No. 1 at 7 ¶ 18.)

2.  "Upon information and belief, Cottrell will attempt to induce employees of IBP or its Affiliates to leave the employ of such entities.  Such inducement would violate the Agreement."  (*Id.* ¶ 19.)

3.  "Upon information and belief, Cottrell is using IBP's confidential information to gain an unfair advantage, and has in his possession or control confidential information which belongs to IBP.  By virtue of his relationship with ABS, Cottrell is using or will inevitably disclose or use IBP's confidential information for his own benefit and/or for the benefit of ABS unless restrained by an order of this Court."  (*Id.* at 8 ¶ 20.)

4.  "Upon information and belief, Cottrell, in direct violation of his obligations under the Agreement, knowingly and willfully entered into a relationship with ABS during the restrictive period and within the geographic region set forth in the Agreement."  (*Id.* ¶ 25.)

5.  "Upon information and belief, Cottrell, in direct violation of his obligations under the Agreement, will solicit or is soliciting customers and employees of IBP or its Affiliates, is using or will inevitably disclose or use IBP's confidential information to gain an unfair advantage for himself or for ABS, and has in his possession or control confidential information which belongs to IBP."  (*Id.* at 8–9 ¶ 26.)

6.  "Upon information and belief, Cottrell has knowingly and willfully taken and retained IBP's confidential information to

assist ABS, a direct competitor of IBP."  (*Id.* at 10 ¶ 37.)

7.    "Upon information and belief, ABS intends to interfere with
these relationships, causing them to cease doing business
with IBP."  (*Id.* at 11 ¶ 44.)

Defendants seek dismissal in part because the complaint, in their view,

lacks "any alleged misconduct beyond Cottrell simply working for ABS—which is

more than 100 miles from Erie.  The Complaint is devoid of the customers or

employees of Plaintiff who were supposedly approached by Cottrell, when this

occurred, the result of such conduct and what forbidden information was allegedly

disclosed." (Dkt. No. 11-1 at 6.)  Defendants acknowledge generally that

pleading upon information and belief is allowed but argue that too much of the

complaint rests on speculation about future events that have not happened and

may never happen.  In response, IBP argues that assertions upon information

and belief can be appropriate when defendants control the details of a possible

violation of a restrictive covenant.  IBP also takes the step of attaching to its

motion papers affidavits from employees that provide information not available in

the complaint.  For example, IBP includes with its motion papers an affidavit from

a Marc Williamson who states, *inter alia*, that "I reasonably believe Cottrell,

through ABS, has been selling, marketing or installing the building products sold,

marketed or installed by IBP in the Rochester, New York area.  Cottrell's

Business Card, which was left near one of IBP's locations, reflects that he is

working as an Energy Specialist for ABS, at the office address of 270 Buell Road,

16

Suite D, Rochester, NY 14624.  A true and accurate copy of the Business Card is

attached hereto as Exhibit B."  (Dkt. No. 15-1 at 3–4 ¶ 16.)  The Exhibit B in

question is a photograph of what appears to be Cottrell's current business card,

though the Williamson affidavit offers no context about the acquisition of the card.

As another example, IBP includes an affidavit from a Jay Oberholtzer that ABS,

through Cottrell, outbid IBP for certain job in Sanborn, New York.  Defendants

object to the inclusion of these affidavits in IBP's motion papers, arguing that IBP

cannot supplement or "back-fill" its complaint through its motion papers.

The parties' arguments require reviewing two sets of principles.  Generally,

courts may not review papers outside of the pleadings when assessing a motion

to dismiss, unless the complaint refers to those papers or otherwise makes those

papers integral to its claims.  *Compare LaBounty v. Adler*, 933 F.2d 121, 123 (2d

Cir. 1991) ("Rule 12(b)(6) does not give the district court authority to consider

matters outside the pleadings; it simply delineates the procedures which must be

followed in testing the legal sufficiency of a complaint.") *with Chambers v. Time

Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) ("For purposes of [Rule 12(b)],

the complaint is deemed to include any written instrument attached to it as an

exhibit or any statements or documents incorporated in it by reference.  Even

where a document is not incorporated by reference, the court may nevertheless

consider it where the complaint relies heavily upon its terms and effect, which

renders the document integral to the complaint.") (internal quotation marks and

citations omitted).  This rule exists because a motion to dismiss challenges the legal sufficiency of a plaintiff's allegations under Rule 8, not the factual evidence behind them.  The rule limiting courts to review of the pleadings sets up why plaintiffs can make some allegations upon information and belief.  As long as plaintiffs have some factual basis for making an accusation, pleading the evidentiary details behind the accusation is not necessary if those details are under a defendant's control.  *Cf. Arista Records, LLC v. Doe 3*, 604 F.3d 110, 121 (2d Cir. 2010) ("To the extent that ¶ 22's allegations are made on information and belief, virtually all of them are supported by factual assertions in Exhibit A . . . . The principal assertion made only on information-and-belief is that defendants' copying and/or distribution of plaintiffs' music were without permission.").  That said, matters pled upon information and belief have to be matters that plaintiffs reasonably believe have occurred.  *Cf., e.g., Menard v. CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012) ("Here, one might not expect precise recollection from a man badly injured by a switched track and shortly thereafter hit and dragged under the train.  By contrast, CSX likely made its own investigation which, if not privileged, could easily reveal just what its employees saw between the switch accident and the denouement.").  In contrast, the Court cannot find any support for the idea that a plaintiff may go beyond inferences from limited information and plead simply what it fears the most.

The above principles guide how the Court will treat IBP's pleadings and motion papers.  IBP both referred to the Agreement in the complaint and attached it as an exhibit to the complaint.  IBP's treatment of the Agreement in the complaint is a perfect example of making outside papers integral to the allegations of the complaint, and the Court will consider the full Agreement accordingly.  In contrast, neither the affidavits that IBP submitted with its motion papers nor the exhibits attached to those affidavits received any mention in the complaint.  The affidavits and exhibits play no role in the events described in the complaint; they merely try to fortify some of the allegations in the complaint to help them withstand defendants' motion to dismiss.  Except as discussed below, the Court will disregard the affidavits and attached exhibits.  As for the allegations identified above that IBP made upon information and belief, paragraphs 18, 19, and the first half of paragraph 26 of the complaint contain little more than guesses about future events that do not follow from and draw no support from any other part of the complaint.  The Court thus recommends dismissing the allegations in those paragraphs and will discuss below how disregarding those paragraphs may affect the formal claims in the complaint.  In contrast, paragraphs 20 and 25, the last part of paragraph 26, and paragraphs 37 and 44 contain allegations of past events that are reasonable inferences stemming from other allegations in the complaint.  The Court thus will consider these paragraphs, subject to further analysis of the sufficiency of the claims to which they relate.

**D.**     ***Claim for Breach of Contract, and Whether the Restrictive***
***Covenant is Enforceable***

The Court now turns to the most contested issue in defendants' motion, whether the Agreement and its restrictive covenant are enforceable and whether IBP can sue for a breach of them.  Defendants make two arguments as to why the Agreement cannot be enforced.  First, defendants argue that IBP has no legitimate interests at stake that require the protection of the restrictive covenant. According to defendants, Cottrell knew little more than the inside operations necessary to manage sales.  Cottrell sold products that were fairly standard in the industry to customers approached through public means.  Cottrell likely has some recollection of day-to-day operations at IBP, but recollections of basic operations do not rise to the level of confidential information requiring protection.  Second, defendants argue that the geographic and time restrictions in the restrictive covenant are unreasonable.  Cottrell was a manager only at the Erie location, which closed.  Cottrell held the Foreman position in Sanborn for only about 20 months before he was fired.  Whatever his title, according to defendants, he was essentially a salesman, and apparently a bad one whom IBP needed to fire. Defendants conclude that there is no reason to lock a bad (in IBP's view) salesman of standard home-improvement products from such a wide geographical area for so long a period of time.

IBP counters defendants' arguments in several ways.  IBP first notes that many of the cases that defendants have cited denied summary judgment or injunctive relief after discovery.  If nothing else, IBP argues for the chance to conduct discovery to determine the extent of defendants' violations of the restrictive covenant.  As for the restrictive covenant, IBP argues that the geographic and time restrictions will protect its trade secrets without harming any public interest.  IBP argues further that "the restrictions in the agreement do not impose an undue hardship on Cottrell as they are tailored to the business of installing building products, and do not restrict Cottrell from working in a sales capacity in any other industry or business, or from engaging in the business of installing building products outside the limited geographic area provided for in the Agreement."  (Dkt. No. 15 at 21.)

"Generally negative covenants restricting competition are enforceable only to the extent that they satisfy the overriding requirement of reasonableness . . . . However, where an anticompetition covenant given by an employee to his employer is involved a stricter standard of reasonableness will be applied.  In this context a restrictive covenant will only be subject to specific enforcement to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee.  Undoubtedly judicial disfavor of these covenants is provoked by powerful considerations of public policy which militate against

sanctioning the loss of a man's livelihood. Indeed, our economy is premised on the competition engendered by the uninhibited flow of services, talent and ideas. Therefore, no restrictions should fetter an employee's right to apply to his own best advantage the skills and knowledge acquired by the overall experience of his previous employment. This includes those techniques which are but skillful variations of general processes known to the particular trade." *Reed, Roberts Assocs., Inc. v. Strauman*, 353 N.E.2d 590, 592–93 (N.Y. 1976) (internal quotation marks and citations omitted); *accord BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y. 1999). "Restrictive covenants are narrowly read because sound public policy considerations strongly militate against sanctioning the loss of a person's livelihood and because enforcement contravenes New York's policy of promoting free trade." *Consol. Brands, Inc. v. Mondi*, 638 F. Supp. 152, 156 (E.D.N.Y. 1986) (citations omitted).

Here, construing all allegations in the complaint as true and as favorably as circumstances permit, several factors weigh against finding the Agreement and the restrictive covenant enforceable. First, the restrictive covenant is excessively broad on its face. By its terms, the restrictive covenant does not restrict the types of home-improvement products forbidden to Cottrell. The restrictive covenant "includes" certain products as examples of products that IBP sells, markets, or installs, but places no limit on the range of those products. The restrictive covenant also does not limit Cottrell to any products that IBP sold while he was a

manager.  If Cottrell currently were selling home-improvement products that IBP

did not sell from 2004–2013 but started selling now then the restrictive covenant

would apply.  The breadth of these terms and the phrase "directly or through

others" limits Cottrell's ability to plan what kind of home-improvement career he

can have that would not infringe on the restrictive covenant.  To highlight the

extent of the problem, the Court compares the restrictive covenant here with the

one struck down in *Columbia Ribbon & Carbon Mfg. Co., Inc. v. A-1-A Corp.*, 369

N.E.2d 4, 6 (N.Y. 1977), which contained similar language about undefined

products and direct or indirect conduct:

| IBP Covenant | *Columbia Ribbon* |
|---|---|
| "[F]or a period beginning on the date hereof and continuing through the second anniversary of the termination of Employee's employment with the Company or any of its Affiliates for any reason (the "Restrictive Period"), Employee will not, **either for Employee's own account or in the service of or on behalf of any other person or entity, directly or through others**, engage or invest in the business of selling, marketing or installing **the building products sold, marketed or installed by the Company** (which products **shall include** residential and commercial insulation, gutters, garage doors, fireplaces, closet shelving, shower doors and mirrors)(the "Business") within a 100 mile radius of the branch of the Company that is currently managed by Employee in Erie, Pennsylvania and within a 100 mile radius of each branch of the Company and its Affiliates that are hereafter managed or supervised by Employee, wherever located." (Emphasis added.) | "The Employee further expressly covenants that he will not, for a period of twenty-four months after the termination of his employment with the Company, **directly or indirectly, for himself, or his agent or employee of, or on behalf of, or in conjunction with any person, firm, or corporation**, sell or deliver any goods, wares and merchandise **of the kind or character** sold by the Company at any time during the term of his employment with the Company, or in any other manner, engage in the sale and delivery thereof within any territory to which the Employee was assigned during the last twenty-four months prior to termination." (Emphasis added.) |

The Court's view of the restrictive covenant here matches the New York Court's view of the covenant in *Columbia Ribbon*: "It is clear that its broad-sweeping language is unrestrained by any limitations keyed to uniqueness, trade secrets, confidentiality or even competitive unfairness.  It does no more than baldly restrain competition.  This it may not do." *Columbia Ribbon*, 369 N.E.2d at 6.

Beyond the comparison to *Columbia Ribbon*, the restrictive covenant also includes the term "invest."  Taken at face value, if Cottrell bought stock in or worked for well-established corporations like Lowe's or The Home Depot then he would be violating the restrictive covenant, even if he worked entirely in-house and had no responsibility for recruiting customers.  The prohibition on "investment" also, on its face, jeopardizes the 15,860 shares in IBP's holding company that Cottrell received in Section 1 of the Agreement in exchange for signing it.  No part of the Agreement contemplates a situation in which Cottrell would have to give up his ownership in the holding company for at least two years.  The Court hesitates to enforce what would amount to a penalty imposed on Cottrell for being fired that partly would nullify the consideration given for entering the Agreement.

The restrictive covenant on its face also creates an excessively large prohibited zone in two different ways.  As Figure 1 above demonstrates, the restrictive covenant would keep Cottrell from plying his trade in all of Western New York; a major portion of Southeastern Ontario including the Hamilton,

24

Mississauga, and Toronto markets; all of Northwestern Pennsylvania almost as far south as Pittsburgh; and a major portion of northeastern Ohio including Cleveland.  IBP does not even sell in Ontario.  IBP would rope off all this territory for someone described in the complaint as having a location close on his watch, losing the "manager" title, and then being fired for underselling and thus not using whatever proprietary information he supposedly could access.   At the same time, IBP ignores the concluding sentence of Section 3, which, despite some awkwardness stemming from sloppy editing, explicitly lifts the prohibitions of the restrictive covenant if IBP closes its branches "and ceases operations in the territory described in paragraph (a)."  (Dkt. No. 1-1 at 3.)  The geographical restriction around Erie—an area described in paragraph (a) where IBP closed its branch and ceased operations—thus no longer applies.  IBP's argument about servicing the Erie population after closing the Erie branch makes no difference, since IBP would be happy to take calls from customers in any number of towns and cities where it does not have branches or "operations."  Surely IBP would not argue that the restrictive covenant would expand to include any town or city that ever called IBP while Cottrell was a manager.

A second factor weighing against enforcement of the Agreement concerns the nature of IBP's business itself.  In the non-exclusive examples of products listed in the restrictive covenant, IBP defines its business as including "residential and commercial insulation, gutters, garage doors, fireplaces, closet shelving,

shower doors and mirrors." (Dkt. No. 1-1 at 2.) At no time does IBP plead that it

designs or manufacturers any of the listed products, meaning that it works with

commercially available products that any customer or competitor could buy.

These commercially available products have market prices that require no

proprietary pricing models; IBP admitted as much when it pled that it fired Cottrell

for "selling work to one of IBP's customers at a below-market rate to IBP's

detriment." (Dkt. No. 1 at 7 ¶ 16.) Additionally, IBP never pled that Cottrell ever

communicated with top IBP officials or worked with top IBP management to

cultivate unique customer relationships. Instead, the complaint describes

Cottrell's highest responsibilities as selling, supervising sales agents, and

"servicing" sales markets. IBP downplays the scope of the restrictive covenant by

noting that Cottrell can pick another industry, but if Cottrell's generic sales skills

are so portable then IBP must be conceding that it kept him away from any

unique sales information that could not carry over to another industry.

Although the Court decided earlier that it would disregard the affidavits

attached to IBP's motion papers, it will note the irony of two of the exhibits

attached to those papers. The first exhibit (Dkt. No. 15-1 at 10) consists of a

photograph of what appears to be Cottrell's current business card at ABS, a card

"left near one of IBP's locations." (*Id.* at 4.) Putting aside the vagueness of what

"near one of IBP's locations" means, IBP does not assert that the "location" is the

location of an existing IBP client. IBP also unwittingly acknowledges that

businesses in the home improvement industry try to recruit new jobs or clients by taking promotional materials like business cards and spreading them around publicly available home and business addresses.  *Cf. Buffalo Imprints, Inc. v. Scinta*, 534 N.Y.S.2d 55, 57 (N.Y. App. Div. 4th Dep't 1988) ("Lists of customers who might be interested in purchasing advertising specialties are readily ascertainable from many sources, including the yellow pages of telephone directories and lists of businesses prepared by chambers of commerce.  Plaintiff concedes that lists of suppliers of novelty items are compiled and distributed by a national trade organization known as ASI, and that most suppliers exhibit their wares at trade shows which are open to the general public.  Therefore, plaintiff failed to prove that its lists of suppliers were confidential.").

The second exhibit that has drawn the Court's attention (Dkt. No. 15-2 at 3) further undermines IBP's arguments about proprietary information.  This exhibit consists of a photograph purportedly showing an ABS truck at a work scene that is "right around the corner from IBP's Sanborn, New York location, for work which IBP also bid."  (*Id.* at 1.)  The keyword in the exhibit is "bid."  IBP would not have to bid for work from long-time customers with whom it has good relations and "whose trade and patronage have been secured by years of business effort and advertising, and the expenditure of time and money, constituting a part of the good will of a business which enterprise and foresight have built up."  *Town & Country House & Home Serv., Inc. v. Newbery*, 147 N.E.2d 724, 726 (N.Y. 1958)

27

(internal quotation marks and citations omitted).  Except perhaps for governmental agencies that are required to solicit multiple offers, IBP would not have to bid for work that it targeted through skillful application of proprietary research and marketing strategies.  By the very fact that it had to place a bid against competing companies, IBP admits that it had no prior relationship with whoever this customer in Sanborn was and that the customer would pick a contractor based on prevailing market prices.

All of the above information together portrays an industry that, at least in part, relies on cold contacts and simple bidding to recruit customers who might need commercially available home-improvement products.  *Compare Kelly v. Evolution Mkts., Inc.*, 626 F. Supp. 2d 364, 372 (S.D.N.Y. 2009) ("EvoMarkets claims to have spent over $200,000 in non-compensatory expenses to help Kelly forge trusting and special, indeed unique, relationships with both our existing and new clients.  EvoMarkets has invested heavily in Kelly's training and networking, trusting him with valuable company information about its customers.  The restrictive covenants to which Kelly agreed were established to protect EvoMarkets' investment in Kelly, and, in the event that Kelly leaves the company, to allow EvoMarkets an opportunity to retain its clients' trust and business through another broker that replaces Kelly.") (internal quotation marks and docket citations omitted) *with Best Metro. Towel & Linen Supply Co., Inc. v. A & P Coat, Apron & Linen Supply, Inc.*, 540 N.Y.S.2d 300, 302 (N.Y. App. Div. 1989)

("Additionally, it appears that the likely customers for the plaintiff's linen supply services, i.e., restaurants, are readily ascertainable from sources as available as a telephone book.").  Whether selling himself or supervising other sales agents, Cottrell was an interchangeable part that IBP concedes can switch to other industries with the same skills.  Cottrell almost certainly would remember any customers that came to him at IBP through bids, business cards, and similar methods of recruitment, but "an employee's recollection of information pertaining to specific needs and business habits of particular customers is not confidential." *Walter Karl, Inc. v. Wood*, 528 N.Y.S.2d 94, 98 (N.Y. App. Div. 1988) (citations omitted); *cf. Veramark Techs., Inc. v. Bouk*, ___ F. Supp. 2d ___, 2014 WL 1364930, at *8 (Wolford, *J.*) (denying a preliminary injunction where, *inter alia*, "Mr. Bouk's knowledge of the intricacies of the sales operation at Veramark, or even his status as its highest ranking sales executive, does not transform him into a unique employee for purposes of a restrictive covenant analysis.")  While IBP would not have to prove anything this early in the litigation, the absence of any assertion of a more complicated business model means that shutting Cottrell completely out of the industry for any period of time seems unnecessarily harsh. *Cf. Newco Waste Sys., Inc. v. Swartzenberg*, 510 N.Y.S.2d 399, 400 (N.Y. App. Div. 4th Dep't 1986) (denying enforcement of a restrictive covenant in part because the former employee "is shown neither to be irreplaceable nor having caused special harm to his employer by his leaving" and because "it is the

29

utilization of confidential information constituting a breach of trust, and not the mere knowledge of a business's intricacies, which is prohibited") (citations omitted).

As for harshness, a third factor weighing against enforcement of the Agreement concerns the burden to Cottrell.  Although he appears to have held different titles at IBP over the years, Cottrell again was a salesman of standard, commercially available products.  *Cf. Brewster-Allen-Wichert, Inc. v. Kiepler*, 516 N.Y.S.2d 949, 950 (N.Y. App. Div. 1987) ("Customer lists in the commercial insurance industry are not confidential, nor are the functions of an insurance agent extraordinary or unique.") (citations omitted); *Reidman Agency, Inc. v. Musnicki*, 435 N.Y.S.2d 837, 838 (N.Y. App. Div. 4th Dep't 1981) ("The insurance business is not unique, nor was Musnicki's assignment with the plaintiff, and the names of insurance customers are not a trade secret.") (citation omitted).  Cottrell has had no notable relationship with IBP's top management at the principal place of business in Ohio.  Cottrell's later track record at IBP doesn't look good: His first try as a manager ended with the closing of his branch within about four and a half years; his second try ended with a firing within two years.  Perhaps to follow a job opening or perhaps out of partial deference to IBP, Cottrell left the Buffalo area to try to continue his career in a new city.  Beyond Cottrell's employment at ABS in itself, IBP has pled virtually nothing in the way of violations of the Agreement that actually have happened.  *Cf. Columbia Ribbon*, 369 N.E.2d 4, 7 (1977) ("[The

complaint] makes no showing that any secret information was disclosed, that [the employee] performed any but commonplace services during his Columbia employment, or, for that matter, that there is any evidence of lost business, lost customers or other damage."). Based, nonetheless, on a broad restrictive covenant, one business card, and one photograph of a truck, IBP would require Cottrell to leave Western New York, Southern Ontario, and a significant portion of other Great Lakes territory before taking another chance at a troubled sales career. New York public policy forbids such a punitive approach to employment management. "A contrary holding would make those in charge of operations or specialists in certain aspects of an enterprise virtual hostages of their employers." *Reed, Roberts*, 353 N.E.2d at 594.

In all, the Court finds that any information that Cottrell acquired at IBP cannot qualify as confidential and proprietary, and that banishing him from his chosen industry based on that information violates New York public policy. Accordingly, the Court recommends finding the Agreement unenforceable in its entirety. As IBP noted when assessing the cases that defendants cited in their motion papers, the Court is mindful that it is making this recommendation without the benefit of any substantial discovery. Nonetheless, the parties have provided enough information through their pleadings and motion papers to persuade the Court that further discovery would not change the legal significance of the relationship that Cottrell had with IBP. Because IBP's first claim relates entirely to

a breach of the Agreement and an improper possession of confidential information, the Court recommends dismissing that claim.

### E.   *IBP's Remaining Claims*

The Court's conclusions regarding the Agreement and IBP's first claim necessitate similar conclusions regarding IBP's other claims.  As discussed above, any information about IBP or the home-improvement products industry that Cottrell obtained at IBP did not result from any unique skill, training, or cultivation of customer goodwill.  Cottrell is a salesman of commercially available products in an industry that uses business cards, advertising, and bids to sell those products at market prices.  IBP again has conceded that Cottrell's sales skills are generic enough that he could apply them to other industries.  If Cottrell's inside information does not qualify as confidential or as a trade secret then IBP cannot accuse him of misappropriating trade secrets or of breaching any fiduciary duties regarding trade secrets.  If the Agreement were unenforceable then IBP cannot accuse either defendant of tortiously interfering with it or of unjustly enriching itself by violating it.  Accordingly, the Court recommends dismissing the remaining counts in the complaint as well.  *Cf. Great Lakes Carbon Corp. v. Koch Indus., Inc.*, 497 F. Supp. 462, 470 (S.D.N.Y. 1980) (rejecting claims of tortious interference and violation of fiduciary duties after rejecting a claim of proprietary information).

## IV.    CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends

granting defendants' motion (Dkt. No. 11).

## V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the

parties by electronic filing on the date below.  Any objections to this Report and

Recommendation must be electronically filed with the Clerk of the Court within 14

days.  *See* 28 U.S.C. § 636(b)(1); FRCP 72.  "As a rule, a party's failure to object

to any purported error or omission in a magistrate judge's report waives further

judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003)

(citations omitted).

SO ORDERED.

_____/s Hugh B. Scott_____
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: April 18, 2014